Good morning, Your Honors. May it please the Court, my name is Mollie Jacobson, appearing on behalf of the appellant, Giannotta Properties, Inc. I would like to reserve two minutes for rebuttal. The nonjudicial foreclosure sale in this case had so many things wrong with it, Your Honor, that it meets California's criteria for setting it aside not just once, but several times. The sale must be set aside in this case for three main reasons, all of which are part of the criteria for California's test. First, Barbaccia purchased the property for an inadequate price at the foreclosure sale. Say that again, counsel. Barbaccia purchased the property for an inadequate price. Grossly inadequate. Grossly inadequate price at the foreclosure sale. Moreover, there are procedural irregularities with the sale. Not just one, Your Honors, but several. And on top of that, there's also unfairness, and California law requires only that there be irregularities or unfairness, and here we actually have both. So, counsel, just so we understand your argument, you're trying to defeat Barbaccia's status as a BFP. Is that your main argument? Well, no, Your Honor. Barbaccia's status as a BFP or alleged BFP doesn't actually impact our argument for two reasons. First, Barbaccia is not a BFP. In the record, Your Honor, the court found on page 30 that he had perhaps may have taken advantage of Giannata prior to the sale. That doesn't defeat the status as a BFP. You've taken advantage. The legal definition of BFP in this case, is that met or not met by the circumstances of this sale? It is not met, Your Honor. There's additional evidence in the record. The more persuasive evidence that Barbaccia is not a BFP is the fact that he had notice prior to the sale of potential problems with the sale. Under California law, a person is not a BFP if that person knows ahead of time that there are potential problems with the sale, and that makes sense, because California's BFP laws are trying to protect innocent purchasers. I'm probably taking you out of the order of argument, and if you want to, you can wait until later, but what are you talking about? Because Williams knew there was a problem without him signing something he hadn't signed? What's the potential difficulty with the sale? Your Honor, two parts to that answer. First off, Mr. Williams' knowledge is, in fact, at issue with respect to the BFP, because in the record at page 115 are Mr. Williams' notes of an conversation that he had with Giannata's attorney four days prior to the sale, where Giannata's attorney told Mr. Williams that there would, in fact, be a lawsuit after the sale. That was conversation number one. Conversation number two, the day prior to the sale, Giannata's other attorney also spoke with Mr. Williams and said that there were problems with the notice, and that he didn't think the sale would go forward the next day. That was reflected in the record at page 115 in Mr. Williams' own handwritten notes. The problem with the notice? Was that Bayside? Who was the problem? Who said it? Giannata's attorney said that they believed there was a problem with the notice and that the sale would not go forward. They also said that for certain, no matter what, there would be a lawsuit after the foreclosure sale with regard to the property. So, Barbaccia... You can't buy if somebody tells you there's a problem with this sale? Your Honor, it's not that you can't buy, but it's that the purchaser, in fact, has noticed there are potential problems with the sale. And under California law, the whole purpose of the BFP rules are to protect the innocent purchasers who walk into a situation without knowing that they may be buying property. A debtor can run everybody else off from the foreclosure if that's that easy. Your Honor, it's not just the fact that there were these conversations. It also shows in the record on pages 116, 118, 123, and 135 to 37 that Mr. Barbaccia received, or his attorney received, a copy of a complaint trying to set aside the sale hours before the trustee's deed was recorded. The trustee's deed was recorded at 3.30 p.m. There's a time stamp in the record on that document, and the uncontradicted testimony at trial is that Mr. Barbaccia's attorney received a copy of the complaint around 9.30 a.m. in the morning. Is that enough to impute knowledge of irregularities? Just because somebody asserts that there are irregularities, is that enough? Yes, Your Honor. He was informed, Mr. Williams was informed on the phone that there were asserted irregularities with the notice, and then they received a copy of the complaint that listed multiple irregularities before the trustee's deed was recorded. But even more important, Your Honors, even more important than all of this is the fact that even if Barbaccia were a BFP, this attack on the foreclosure sale is still not precluded. Mr. Williams, Barbaccia's attorney, submitted just this week a case called Melendrez to this Court's attention. In Melendrez, the Court said that the BFP presumption only precludes attacks on the sale if that attack is based on a defective notice of default or a defective publication or something of the notice of sale. That's not what we're alleging here, Your Honors. We are not contesting that the notice of default was served incorrectly. We are not saying that the notice of sale was somehow incorrect or not published in the right way. What we are saying is that California's standards for setting aside a foreclosure sale have been met. For example, Your Honors, there was a gross inadequacy of price. The trial court found on page 24 of the record that Mr. Williams acquired the property for Barbaccia with cashier's checks totaling $690,000. The trial court also found on page 24 of the record that the property was worth $10 million if two conditions were met, both of which are met in this case. The court found the $10 million figure? I know there was some money. I thought it was something like $2 million, a little over $2 million. The court, Your Honor, stated that there were three possible valuations of the property, depending on the value of the property. Depending on which conditions were met, and in this case, the conditions for the $10 million valuation have been met. What are those conditions? The first condition, Your Honor, is that there be a mobile home park resting on the property, which there is. The court found on page 20 of the record that Barbaccia operated a mobile home park on the property, and it's still there. The second condition, Your Honors, for the $10 million valuation is that there not be any lease encumbering the property. The court found on page 24 of the record that when Barbaccia acquired the property at the trustee's sale, he merged what had been his prior leasehold interest with the fee simple interest in the property. I thought he had to pay off those. I thought he had to pay off those loans. The property was encumbered. Didn't Barbaccia have to pay off that in addition to the $600,000? The trial court didn't make any finding of facts on that issue, Your Honor. With respect to whether the purchase price is the $690,000 in cashier's checks at the sale, or that amount plus some other amount, there's no finding in the record, first off. Barbaccia was out $1,200,000. He argues, I believe, Your Honor, that his purchase price was $1.1 million. We contest that. We argue, Your Honor, that the purchase price is actually $690,000, which is the amount he paid in cashier's checks, and if you look, Your Honors, at the cases in California dealing with the set-asides of foreclosure sales, when the courts look at inadequate purchase price, they look at the amount paid at the sale. In Worcester, decided by this very Ninth Circuit, they looked at the amount paid at the sale. Wasn't this sale, wasn't it a foreclosure of a third? It was, Your Honor. It was. Well, didn't the purchaser take subject to the prior? There's this first trustee, then a second trustee, and tax claims. He did, Your Honor. So this isn't just a clean piece of fee-simple property with nothing wrong with it. There's a whole bunch of luggage going with it. That is correct, Your Honor. Two responses to that. First off, the cases, particularly Whitman and Bank of Seoul, where the court set aside foreclosure sales due to inadequate purchase price, they only looked at the amount expended. Second, even if – But how can you just look at the amount expended and not even look at the value of the property? There's nothing to compare it to if you just look at the amount expended. Your Honors, even – assuming for the moment that the purchase price was $1.1 million, and assuming that the – let's take two scenarios. Assuming that the valuation is the $10 million valuation, which is, in fact, a correct valuation, because there is a mobile home park on the property, and there is no longer a lease encumbering the property, that's still only 11 percent – Let's assume we don't agree that it's $10 million. Yes, Your Honors. Then would you analyze whether or not there was a gross underpayment? Yes, Your Honors. If the purchase price is not – excuse me, if the valuation is not $10 million, but it's the $2,020,000 valuation, then even in that scenario, the amount he expended, assuming it was $690,000, then he spent 34 percent of the property's value. And in the case Bank of Seoul, the court found a quote-unquote gross inadequacy when the purchase price was 32.5 percent of the property's value. So even in that case, Your Honor, it still meets the criteria. In terms of the irregularities, there were several irregularities in this case. Perhaps the most egregious was the trustee's failure to honor a postponement from 9 a.m. to 3 p.m. on the day of the sale. The court found on page 24 of the record that on the morning of the sale, Giannata's attorneys walked into Bay County's office. Bay County was the foreclosure service that was conducting the sale. Giannata's attorneys asked a man in the office whose name is Larry Galusha for an extension because they were quote-unquote meeting with a judge that morning. That meeting with the judge was going to be an application for a TRO to forestall the sale. Mr. Galusha, the court found on page 24, called a woman who used to own Bay County's and who was an employee of Bay County's to ask if he could postpone the sale. Did she own Bay County's at the time in question? The court found in its findings of fact that she had resigned her position as of the 13th. Well, how could she give, how does she have authority to postpone a sale if she had resigned? Your Honor, the question in this case isn't so much, the question is not whether Galusha or Joy had actual or apparent authority to continue the sale. The issue in terms of the irregularity is that the borrower received in writing from somebody standing in the foreclosure service office a six-hour postponement. From GPI's perspective, they received a written postponement from somebody standing in the foreclosure service office who had made a phone call who appeared to have authority to give them the six-hour extension of time. That's an apparent authority argument, right? Let me rephrase, Your Honor. Not the fact that he had the authority to do so, but that they had received something that looked like they had gotten their six-hour extension of time. You settled with her employer. Yes, Your Honor. Yes, Your Honor. That's not Marcia. That's not his problem. That's not his problem, Your Honor, but it does indicate an irregularity. This is not the scrupulous regularity that the courts require. It's not the case that during the normal course of foreclosure sales, borrowers receive a six-hour extension of time that is then subsequently not honored. But how could that be imputed to the buyer? Your Honor, the law in California doesn't require that any irregularity be imputed to the buyer. It simply says that there must be an irregularity, a procedural irregularity. Well, there are two policies at issue here. One is the protection of the trustor, and the other is protection of the BFP. And if we assume that the buyer were a BFP in this case, then any irregularities are purged. Let me understand the court's comment. Aren't they? It's not the case, Your Honor, that if Mr. Barbaccia were a BFP, the irregularities would be purged, because the BFP presumption only helps Mr. Barbaccia if we are attacking the notice of sale or the notice of default. And that's not what we're attacking here. Counsel, the case you cited, Melendrez, at page 429, says, we begin with the general proposition that the trustor cannot set aside a foreclosure sale to a BFP based on irregularities in the foreclosure sale process, except in the case of fraud. That doesn't make the statement that you're making. It doesn't make the distinction that you're making. Your Honor, Melendrez, in another portion, does say that the BFP conclusive presumption applies only for challenges to the notice of default or notice of sale proceedings. With respect to ---- How much are you relying upon in Melendrez? What page are you on? I'm sorry, Your Honor. I don't have it with me, but I can give it to you, Your Honor, in my rebuttal. I'll give it to Your Honor on rebuttal. All right. However, Your Honor, there were other problems with the sale. For example, it was improperly postponed from a Sunday to a Tuesday. The sale had been scheduled for Sunday the 15th. And under section 29 ---- How did that prejudice anybody? You knew that. It arguably prejudiced Giannotti, Your Honor, in the sense that it may have precluded other purchasers or other bidders from appearing at the sale. And the Court did find that Mr. Barbaccia was, in fact, the only bidder who appeared. And the purpose behind the requirement that postponements be announced at the time of the sale is to alert the public to the fact that it will be taking place at a different time and a different date and location. And the trial court in this case found that the foreclosure service had continued the sale simply by leaving a recorded message on its answering machine the Friday beforehand, which is not what's required by section 2924G. Your Honor, in several cases, Systems Investment Corporation, for example, California courts have found that there must be strict adherence to the statutory requirements set forth for nonjudicial foreclosure proceedings because they are a harsh remedy that occur without judicial oversight. And the fact that there's any deviation from the statutory requirements makes it very, very unfair for the trustors. In addition to all of these irregularities, Your Honor, there was also unfairness in the sale. The trial court actually found on page 30 in the record that in some moral sense, Barbaccia may have taken advantage of Giannotti. And there was a lot of back and forth at the trial court level as to whether Mr. Barbaccia had ever received an appropriate estoppel certificate to sign. That totally aside, there was still unfairness with respect to the sale. Mr. Barbaccia had an interest in the property because he had a leasehold interest in it. It was a 50-year lease. He had a duty to sign an estoppel certificate. Whether or not he ever received one, there were lots of negotiations and conversations between counsel and the parties about the estoppel certificate. Mr. Barbaccia had promised to sign an estoppel certificate and at one point told Mr. Giannotti that he had, in fact, signed it already, and he told Mr. Giannotti I'll do whatever it takes to help you out. Then he disappeared in the days prior to the sale. And during the course of all these conversations, Your Honor, he had instructed his attorney six weeks prior to bid at the foreclosure sale while he was having all of these various conversations. He admitted that himself in his own testimony at trial. So, Your Honors, in addition to these irregularities, there is also unfairness, and for that reason, we ask the Court to set aside the foreclosure sale and to reinstate title on Giannotti. And with the Court's permission, I'll save my last minute and a half for rebuttal. All right.  Thank you. Robert J. Williams. Good morning, Your Honors. I am Robert J. Williams and I am here for the Barbaccias. And first of all, may I ask, and I think the answer is going to be yes, you did receive the two additional citations that I sent up this past week. What were they? Melendrez and Knapp. Yes. Yes. All right. Then I would like to begin by saying that we grow too shoen old and too late smart and say that I, in preparing for this proceeding this morning, I felt that I would like to take a moment and refine the focus of the Barbaccias brief on standard of review, because I think that this entire case really rests on standard of review. And with that in mind, I will say that the procedural irregularities become the focus or the fulcrum on which this case rests, because if the trial court and the district court were correct in their assessment of the impact of these procedural irregularities, then all the rest of the issues like inadequacy of price, valuation, BFP and so forth just become irrelevant.  All right. As to these procedural irregularities, there are three, and they must be directed or addressed independently. In our brief, what we have said is that the district court applied the appropriate standard, which is that this court reviews de novo conclusions of law, and on factual findings the standard is a clear error. I believe that that's still true. But what I failed to do, and I want to kind of correct at this point, is to nuance that standard with the basic three procedural irregularities that are alleged. So if I may, the first is that the agreed postponement, that is, the one that was done by stipulation, was not followed in the sense that the postponement process didn't take place. So the standard of review on that issue ---- Which postponement are you referring to? Are you from Friday to ---- No, it's ---- Which one? But that's not the one at issue. The one at issue is the postponement from the Sunday to the Tuesday. That's the one at issue, but I include all of them. Well, let's talk about that one. What's our standard of review on that, on the postponement from Sunday to Tuesday? It's de novo because the trial court decided that issue on partial summary judgment against the appellant and did so on the basis that appellant failed to avail himself of the opportunity to develop a triable issue of material fact. That's why I believe that standard is de novo, because the court is reviewing a summary judgment procedure. On a summary judgment, the issues are only of law because there's supposed to be no triable issue of fact if you're going to grant summary judgment. So that's what we submit on that issue. Now, I ---- Would you address the merits of it then? I'm sorry? Would you address the merits of the issue, whether or not the court erred in saying that there was no irregularity in postponing the sale from Sunday to Tuesday with only a recording to let people know? Right. The merits, forgetting the fact that the court already decided it on summary judgment ---- Well, we have to decide it, too, so I'd just like to know what you're ---- Yes. Forgetting that. There is no evidence of what happened. All there is is evidence done by deposition testimony of an office or an employee of the trustee named Maricela San Miguel, who testified at deposition basically what the normal standard would have been. There is absolutely zero evidence as to what happened, neither side, because we didn't know. Okay. But if the normal ---- that's evidence. If the normal practice is to leave a recording the Friday before, that's the only evidence we have, and that's what the judge considered in summary judgment. Was that an irregularity? That alone would not have been. Was that compliance with the statute? It would have been, because the real question was what happened on Sunday. In other words, the trustee could give notice by recording on Friday that this is what was going to happen. What does the statute require if there is a postponement? For there to be a postponement, it requires that somebody appear and announce a postponement. And that's the problem here. Nobody or there was no evidence that that was not done. Well, was there any evidence that it was done? No. Okay. And that's why what we say, what the barbachos say, is the appellant here, as plaintiff, bore the burden and wasn't able to ---- Well, on summary judgment, the evidence is considered in the most favorable light to the nonmoving party, right? Right. There still wasn't. You see, on summary judgment, there was no evidence at all. So your argument is that because the buyer, I mean, because the trustor had the obligation to show irregularity, if there was no evidence, they lose. That's correct. Now, but I'm focusing on this question of the standard of review, and in trying to answer the Court's question, there is another side of this, and that is that the plaintiff or, pardon me, the appellant here had actual notice of what was going to happen, had agreed on what was to happen, and then, again, standard of review. I'm ---- So your position is that the appellant had no ---- knew and agreed that the sale was going to be postponed from Sunday until Tuesday? Yes. And where is that in the record? That is a stipulate ---- pardon me, if I can have a moment. That is the ---- there was testimony by the ---- by Gianotto's lawyer. Pardon me. There was a transcript of remarks before the Court on the Thursday. If the sale was Tuesday, it was about Thursday before, in which he acknowledged to the Court that the sale was going to be postponed until Tuesday. That's different than a stipulation. A stipulation is agreement between the parties, normally in writing. I misspoke if I said stipulation. It was the evidence of that knowledge rests in the remarks of the appellant's counsel to the bankruptcy court, to the effect that they all knew that the sale was going to be postponed until Tuesday. From Sunday to Tuesday. Now, where is that in the record? If you'll give me a moment, I ---- let's see. Let me just ---- If I can refer to page 21 of the appellee's report. All right. I will read, though. It's easier. The transcript of the proceedings at the hearings before the bankruptcy court on January 12th. And the reference to the record is the supplemental excerpts from the record, 121 to 136. That's the entire transcript of those proceedings. And the transcript, it was transcribed, and it is a trial exhibit 214. And what it does is establish conclusively that as of January 12th, 1995, Giannata had actual notice that the trustee intended to conduct a postponed sale on the morning of January 17th, 1995. And if I can be more specific, Judge, you want this record, so I'll jot this down for you. I referred to three specific citations. Page 122, lines 5 to 20. Page what? 122, lines 5 to 20. And you said this was the supplemental excerpts of record? Yes. And whose supplemental excerpts? It was the appellee's. All right. Okay. I'm sorry. I think those we got two designated the same way somehow. It's a thicker one. All right. Okay. Okay. I'm going to page 121 of the excerpts of record. Okay. Now go to 122, lines 5 to 20. Okay. Yep. It says we have a sales set, foreclosure sales set for next Tuesday. Right. Now I have 129, 23 to 28. Now was counsel for the trustor there? That was the counsel for the trustor speaking. That's Poe? Correct. Okay. All right. All right. 129, 23 to 28. And 130, line 20 to 131, line 8. All right. Now, again, on this subject of the standard of review, I believe it's incumbent upon us to make it clear that the case of In re Worcester, on which the Gianottas rely, is one with which we do not disagree in the sense we don't counter this. And the reason is Worcester states the correct standard of review on these irregularities. It decided the materiality of the irregularity. And the standard of review on the materiality of the regularity we concede is de novo, because that's an issue of law. And the problem here in the appellant's case is that on this issue of both the postponements, they have never been able to establish that if there were an irregularity, it was material because they've not connected in a causal way any actual prejudice with the alleged irregularity. What about the failure to postpone the sale for six hours when the attorney went to the office? All right. The appellee's position on that is that there is no evidence whatsoever that anybody within the office of the trustee with any authority, actual or apparent, did anything, anything, period. What this gentleman in the office who happened to be a subtenant did was beyond anybody's authority to bind the trustee. Don't you think it's a little curious that the file disappeared the day after the sale? You know, Judge, there's a lot about this case that's curious. In other words, the fact that this gentleman was in the office and did it, you know, and engaged in conversation with them at all is curious. I can't imagine what he thought he was doing, but I can't say any more than that. It is curious. Now, the file disappearing, the only evidence that might bear on that is the fact that this lady, Diane Joy, had sold the business. You know, apparently, Galusha called her and said something and then said something to Mr. Gianotta's lawyer. But the only explanation that I can suggest, but again, I'm speculating and trying to answer your question. There's no indication one way or another of why that happened. And certainly there's nothing that connects the Barbaccias, my clients, to that situation. Kennedy, did the record show about when you first learned of that, your client? Oh, the disappearance of the file? No. When did your client first learn that that postmortem had been agreed to? All right. Now, if it had. This is or does the record not show? That's what I was going to say. The record does not show it. I can't answer it. That's enough. Counsel, did the bankruptcy court or the district court make a finding regarding whether or not your client was a BFP? No. There was never a finding made? There was never a finding made on that issue. And if you will, bearing in mind the significance of irregularities, the bankruptcy court and the district court found there were no irregularities that were material. And therefore, it's not necessary to go down that path. Was it true that the Barbaccias hadn't paid any rent on this lease? It's probably not true. What's that? I'm sorry? The thing didn't pay rent. Yeah. What about the other curious about it? You said there are a lot of curious things about it. I was curious about the allegation there that the Barbaccias hadn't paid any rent on this wonderful lease for three and a half years. May I address that? Yeah. I have to do that within the context of the record, however. Well, yeah. The lease is in evidence, so I can refer to that. The lease had a rather obscure formula for determining the rent. And I think it's best to left the room. I could take you through it, but I don't think you want to waste the time. But it had a rather obscure formula. I don't want to have less than three minutes. Right. So there was a disagreement between Lessor and Lessee over how that formula worked. And to put it into a nutshell, in the formula, there was a cost of living adjustment built in. And later on down the mathematical trail, that cost of living adjustment was taken out. Now, that's just a matter of plain, simple algebra. That was the beef. So it isn't that Barbaccia wasn't paying rent. It's that Giannata was claiming a cost of living component of this that wasn't there. That was it. Did you ever litigate this, this rent question? No, Your Honor. That hadn't appeared in bankruptcy court or otherwise?  It appears that Giannata abandoned that at some point in time. That went on for three years, as I recall. What is that? The rent issue, whether or not Barbaccia was paying rent. I think it probably did run that long. But it was, as I say, there was. I thought maybe it was because Barbaccia was paying off this other loan. No. But that doesn't figure. I'm wrong. That does not figure. That's correct. But on the other hand, you know, Barbaccia did take, subject to that Foley loan, that $420,000 or so, and the tax liens. So that's there. Counsel, before your time expires, could you please address the question regarding the value of the property and whether the sale amount was grossly under market value? All right. I did this in my brief, and I'll just kind of concentrate that a little bit. It involves inherently a question of the value of land being a matter of components. You can evaluate land by time. You can evaluate land by quantum of title. You can do a lot of things. In this case, you have a leasehold, and you have the freehold or the fee. Now, the only thing that the appellant had here was the leasehold. I mean, the freehold, the fee. So you have evidence that the value of that part of it. Probably a 50-year lease. Right. So you have evidence that one appraiser testified at $2 million, another appraiser testified at $1.5 million. That's the value. So this $10 million figure assumes that somehow there's a magical increase if you get rid of the lease. Well, you know, the lease was very advantageous to Barbacia. But, you know, you have to realize in assessing all of this that what does the record show Barbacia had to pay? $680,000 or something like that. What does it show he had to pay about the prior mortgage holders? $420,000. Is that all? Yes, plus a small amount of tax liens. So I heard, I thought, a figure of $1.2 million. That's what I added up. Right. You like that. Right. All right. Counsel, your time has expired. Well, thank you. Thank you. And I appreciate being here. All right. We appreciate having you. Thank you. Rebuttal. Just two quick points, Your Honor. Number one, I don't have my Melendrez case with me. So if the Court's permission, I will submit a very brief rebuttal. Never mind. We'll read it. Thank you. Okay. Second thing, Your Honor, just very quickly, counsel mentions that the bankruptcy court had found there was no procedural irregularities. That's not the case. The bankruptcy court made no finding whatsoever with respect to the standard to set aside the sale. The district court did so find that there were no irregularities. However, Your Honors, the district court relied, number one, on a case for breach of contracts when it came to that conclusion. And this is an equitable case. And so the Reddickey case doesn't have any impact here. And also the court improperly relied on Section 11 for the continuance from Sunday to Tuesday. And Section 11 doesn't apply here because that's a very general statute and the more specific statutes in the foreclosure proceeding statute. Well, what about the transcript that opposing counsel referred us to where it was acknowledged that the postponement was going to be until Tuesday? How can you say that's a material irregularity if it were acknowledged? Your Honor, the public didn't have notice necessarily of that continuance. Giannata may have had notice, but the public didn't, and therefore there were perhaps less bidders. And there are cases in California that specifically state the whole purpose of these requirements is to give the general public as much notice as required for a fair sale and competitive bidding. But how can you rely on an irregularity that you knew about? It would appear to me that at that point you should say, well, the public doesn't have notice of this, and so this is an irregularity that needs to be corrected, rather than going along with it and then trying to use that as a basis for negating the sale. Your Honor, if I may, Giannata never went along with the sale. Giannata was trying very hard for there not to be a sale, and Giannata was in court at 9 a.m. on the morning of the sale seeking a TRO when the sale took place, regardless of the postponement. Do you have any final points you want to make? No, thank you. All right. Thank you, counsel. Thank you to both counsels. The case just argued is submitted for a decision by the court. The next case on calendar for argument is CIMO v. General American Life Insurance.
judges: Goodwin, Reavley , Rawlinson